**SEALED**

RECEIVED CLERK
DEC 14 2011
U.S. DISTRICT COURT

Victor A. Sipos, Utah Bar No. 9211
UTAH LITIGATION CENTER
10421 South Jordan Gateway, Suite 600
South Jordan, UT 84095
Tel: 801-860-3444
Fax: 801-665-1266

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

DEC 16 2011

D. MARK JONES, CLERK
BY _____
       DEPUTY CLERK

Attorney for Relator Bart Andersen

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BART ANDERSEN,<br><br>  Plaintiffs,<br><br>vs.<br><br>BIG-D CONSTRUCTION CORPORATION; CREATIVE TIMES DAY SCHOOL, INC; CACHE VALLEY ELECTRIC COMPANY; ADVANCED SOLUTIONS GROUP, LLC; and DOES 1-100,<br><br>  Defendants. | Case: 1:11-cv-00176<br>Assigned To : Waddoups, Clark<br>Assign. Date : 12/14/2011<br>Description: SEALED v. SEALED<br><br>Description: Sealed v. Sealed |

**FALSE CLAIMS ACT COMPLAINT
AND DEMAND FOR JURY TRIAL**

<u>**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**</u>

<u>**DO NOT PLACE IN PRESS BOX**</u>

<u>**DO NOT ENTER ON PACER**</u>

## I. INTRODUCTION

### A. Summary of Relator and Defendants' wrongful conduct.

1. Defendant Big-D Construction Corp. ("Big-D') touts itself as "one of the nation's largest and most admired construction firms," claims it is "known for long-standing principles of fairness and honesty," and proclaims the motto: "There is no difference between what we say and what we do." *http://www.big-d.com/our-history.php*. But in reality, Big-D has engaged in repeated and systematic efforts to defraud the government for its financial gain.

2. In 2007, the U.S. Army Corps of Engineers awarded Big-D a contract to design and build the F-22 Fueled Composite Aircraft Overhaul and Test facility, currently Building 674 at Hill Air Force Base ("F-22 Hangar Contract"). The contract was originally valued at about $20 million and was scheduled to be completed in 2009. By completion it had become a $39.5 million project that was completed in 2010. Big-D engaged in multiple fraudulent acts in connection with this project, including:

    a. Repeatedly submitting fraudulent change orders that either overstated expenses or understated savings for Big-D to perform a certain job;

    b. Knowingly violating the Buy American Act by purchasing and installing foreign-made materials that did not comply with requirements of the act; and,

    c. Intentionally frontloading invoices submitted to the government such that it amassed unearned payments of well over $6 million dollars.

3. With multiple other government contracts, Big-D violated laws designed provide opportunities to promote economic development and employment growth in distressed areas. The United States government incurs significant expense to provide benefits to historically disadvantaged groups and communities; Big-D and its co-conspirators usurped these opportunities for themselves.

## II. JURISDICTION AND VENUE

4. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

5. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.* and complained of herein took place in this district, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all material and relevant times defendants transacted and continue to transact business in this District.

6. Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

## III. PARTIES

7. Relator Bart Andersen ("Relator") is a U.S. citizen and resident of the State of Utah. Relator brings this action based on his direct, independent, and personal knowledge and also on information and belief. He is an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B). Relator believes the information herein has not yet been publicly disclosed. Relator was employed by defendant Big-D from 1999 to 2002 and again from 2006 to 2008. Relator was employed by defendant CTI from 2008 to 2010.

8. The United States of America, through its various departments and agencies, awards construction contracts to qualified companies.

9. Defendant Big-D Construction Corp. ("Big-D') is a Utah corporation that has been awarded numerous government contracts related to design and construction, including the F-22 Hangar Contract. Big-D is not a "small business" as the term is defined by the Small Business Administration.

10. Defendant Cache Valley Electric Company ("Cache Valley Electric") is a Utah corporation that was an electrical subcontractor for Big-D on the F-22 Hangar Contract.

11. Defendant Creative Times Day School, Inc. is a Utah corporation that does business under multiple DBAs, including Creative Times, Inc. and CTI Construction ("CTI"). It claims to be a minority-owned SBA-certified HUBZone small business concern ("SBC"), and was (and may still be) an SBA-certified Section 8(a) participant. CTI and Big-D have been contract partners on multiple projects.

12. Defendant Advanced Solutions Group, LLC ("ASG") is a Utah limited liability company. It claims to be a women-owned and a minority-owned SBA-certified HUBZone SBC, and an SBA-certified Section 8(a) participant. ASG and Big-D have been contract partners on one or more projects.

13. DOES 1-100, inclusive, are the fictitious names of those defendants whose true identities are unknown to Plaintiff and whose true capacities, whether as individuals, corporations, partnerships, joint ventures and/or associations, are also unknown to Plaintiff. Each fictitious defendant is in some manner responsible for the acts and occurrences hereinafter set forth. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

## IV.   FACTUAL ALLEGATIONS

### A. Big-D engaged in pervasive fraud in connection with the F-22 Hangar Contract.

14. In 2007, Big-D was awarded the F-22 Hangar Contract. Relator worked for Big-D at the time it was awarded the contract and the project was still underway when Relator left his employment with Big-D in 2008.

15. Soon after Big-D was awarded the F-22 Hangar Contract, Big-D learned it had made a significant mistake on its bid documents. As a result of the mistake, Big-D had underbid the project by about $1 million. When Big-D management became aware of the problem, it directed the project team (including Relator) to take actions to ensure that Big-D recovered the mistake.

16. In an effort to recover from the mistake, and then to profit further, Big-D engaged in

multiple fraudulent acts in connection with the F-22 Hangar Contract. These acts included submitting knowingly false change orders, frontloading contract costs to amass an enormous cash balance, purchasing and using materials that violated the Buy American Act, and retaining funds from subcontractors.

### 1. Big-D submitted fraudulent change orders.

17. Because the F-22 Hangar Contract was a design build contract, Big-D aggressively challenged the designs and changed those designs in a way that improved defendants' financial position at government expense. Specific fraudulent conduct related to the redesign of the tow way, relocation of a power line, revision of the HVAC system, and redesign of the hangar.

#### a. Tow way redesign.

18. The original F-22 Hangar Contract Request for Proposal ("RFP") contemplated an aircraft tow with specified thicknesses at various sections. During the design phase of the project, Big-D worked with its asphalt subcontractor to estimate savings that could be realized by reducing the tow way thickness and it was determined that this modification would result in savings of at least $200,000.

19. Big-D proposed the revision to the government though a deductive change order that falsely claimed the change would reduce the contract price by about $60,000. Internally, Big-D discussed and knew that if the government approved the change order, it would generate a financial benefit for Big-D that was many times greater than the amount of savings represented to the government.

20. The government approved the change order, the tow way was built to the revised thinner specifications, and the government saved about $60,000 as a result of the change. Several months later, in late 2008, Big-D contacted demanded about a $200,000 credit from the asphalt subcontractor for the reduced thickness of the tow way. As a result, Big-D fraudulently gained a benefit of about $140,000.

### b. Relocation of a power line.

21. The F-22 Hangar Contract RFP showed that the hangar would be built directly over a major power line. When bidding on the F-22 Hangar Contract contract, Big-D and Cache Valley Electric, its electrical subcontractor, knew the power line would need to be relocated as part of building the hangar.

22. Cache Valley Electric helped Big-D design the hangar with respect to the electrical work. Cache Valley Electric's project manager told Relator that the original bid it had submitted to Big-D had incorporated estimates to relocate the power line, but then advised that it could submit a change order claiming it had been unaware of the need to move the power line and asking for additional money to relocate it. This project manager explained that perhaps the government would approve the change order and opined that the worst-case scenario would be that the government denied it.

23. After considering Cache Valley Electric's statements, Big-D management instructed the change order to be prepared and submitted. Upon information and belief, a change order was submitted for more than $500,000 to relocate the power line.

24. The government approved the change order. As a result, the government paid more than $500,000 to complete work that had already been included Big-D's and Cache Valley Electric's original bid.

### c. HVAC system.

25. The original F-22 Hangar Contract design called for the HVAC system to be housed in a central plant, i.e., a separate facility from which heating and cooling would be distributed to the F-22 hangar.

26. But the original bid provided to Big-D by its HVAC subcontractor was based on the installation of a roof-top HVAC unit, not a central plant. Before submitting its final bid to the government, Big-D had failed to realize the subcontractor's plan did not comply with the RFP

requirements.

27. During the design phase, Big-D and the HVAC subcontractor estimated it would add many hundreds of thousands of dollars, or more, for the subcontractor to convert its plan from a roof-top unit to a central plant. Big-D realized it would be financially impractical to incorporate the central plant design.

28. To solve the problem, Big-D submitted a deductive change order whereby it proposed installing a roof top HVAC unit instead of a central plant. The change order fraudulently misrepresented the estimated savings that would be realized by proposed change. The savings Big-D represented to the government was hundreds of thousands of dollars less than the true estimated savings. Big-D knew it would reap an enormous financial benefit at the government's expense if the government approved the change order.

29. The government approved the change order. A roof-top HVAC unit was installed.

### d. Redesign of the hangar footprint.

30. During the hangar design phase, Big-D determined it could save significant expenses on the project by submitting a plan that reduced the size of the hangar's footprint from the design described in the RFP. In these discussions, Big-D personnel acknowledged the reduced size would not comply with certain RFP requirements, but that the government was unlikely to discover the difference.

31. Upon information and belief, Big-D submitted a plan that was smaller than required by the RFP but certified it complied with the RFP. Ultimately, the government approved the design without noticing the non-compliance.

32. As a result of change, Big-D realized significant savings without giving any credit to the government for the change.

### 2.   Big-D submitted falsified pay applications.

33. Big-D regularly submitted falsified pay applications to the government in order

"frontload" payments it would receive from the government.

34. The practice of "frontloading" involves placing a fraudulently high value on contract items performed early in the construction process, and reducing the value of items performed later in the process. As a result, a contractor amasses a financial cushion consisting of money it has not yet earned.

35. Frontloading is unlawful and exposes the government to significant losses. If the contractor is unable to complete the project and a replacement must be hired, insufficient funds would remain to pay the replacement the reasonable value of remaining work. Also, the contractor who has received frontloaded payments is often in a stronger negotiating position with the government and subcontractors and can obtain financial advantages. And, of course, the government loses the time value of the money it paid early.

36. Big-D unlawfully frontloaded expenses on the F-22 Hangar Contract. It submitted a schedule of estimated costs for the project on critical path method ("CPM") forms. These forms listed several hundred activities, making them difficult and costly for the government to verify and therefore easy to falsify. On these forms, Big-D intentionally frontloaded expenses, increasing the price of earlier projects and intending to reduce the price of later projects.

37. As earlier projects were completed, Big-D submitted invoices to the government for payment. But the invoices submitted by Big-D were not based on invoices it received from subcontractors. Instead, they were based on Big-D's fraudulently inflated estimates on the CPMs. Big-D had so aggressively frontloaded the CPM estimates that for a time the government had paid Big-D about $7 million in excess of what Big-D had been invoiced by its subcontractors.

38. The frontloading reached such a magnitude that Big-D could no longer present a coherent story on differing government reports. For instance, through the F-22 Hangar Contract, Big-D agreed that a certain percentage of the work would go to qualified HUBZone and/or

Section 8(a) subcontractors. Big-D was required to certify compliance with this plan on forms SF294 and SF295. But Big-D had frontloaded to such an extent that the payments to these subcontractors did not satisfy the percentage requirements of the subcontracting plan.

39. In an effort to conceal the frontloading problem, Big-D fraudulently inflated amounts on the SF294 and SF295 subcontracting forms, and thereby falsely certified that it had paid certain subcontractors a sufficient percentage of the amount that the government had paid.

40. In reviewing its actions, Big-D determined it had violated the False Claims Act and considered self-reporting the violations. But Big-D management refused to self-report, fearing it would negatively impact the company's ability to win further government contracts.

41. Big-D enjoyed several benefits as a result of its unlawful frontloading. It received the time value of money, had the ability to negotiate with the government and other contractors from a position of greater financial strength, had funds to pay the contractor whose bids had been erroneously entered, had the ability to obtain special pricing benefits from subcontractors (without passing the benefits on to the government), and had the financial means to extract unfair advantages to win future government contracts.

42. For instance, Big-D used the money to secretly install additional electrical conduits under the F-22 hangar. Big-D did not disclose these conduits to the government or to its competitors. When bidding on Phase II of the F-22 hangar project, Big-D could incorporate the use of these secret conduits into its bid while its competitors' had to submit bids without knowledge of the cost-saving features.

### 3. Big-D falsely certified compliance with the Buy American Act.

43. The Buy American Act, 41 U.S.C. § 10a, states that except for certain limited circumstances, "only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States, shall be acquired for public

use." *41 U.S.C. § 10a.* The law enforces compliance by requiring that "[e]very contract for the construction, alteration, or repair of any public building or public work in the United States ... shall contain a provision" consistent with the requirements of 41 U.S.C. § 10a. *41 U.S.C. § 10b(a).* A violation of the act can result in a contractor being blacklisted for three years. *41 U.S.C. § 10b(b).*

44. The F-22 Hangar project required the installation of two overhead cranes in the hangar. The main beams in the cranes did not satisfy requirement of the Buy American Act. Employees from Big-D and the steel subcontractor told Relator that the beams did not comply with the Buy American Act. After Relator informed Big-D management, he was instructed to leave the issue alone because the cranes had already passed inspection and it was exceptionally unlikely the government would discover such a violation.

45. Portions of the F-22 hangar project were constructed using hundreds if not thousands of anchor bolts. The bolts from one supplier came with a specification sheet that indicated the bolts did not comply with the Buy American Act. Compliant bolts from another supplier were more expensive. Big-D management decided to purchase the non-compliant bolts, and instructed that upon receipt they should be removed from packaging and placed into generic buckets and the packaging should be destroyed. That way, if there were any inspection, there would be nothing to indicate their origin.

### 4. Big-D retained a portion of payments from subcontractors even though it certified to the government that it had not.

46. In non-federal contracts, general contractors commonly retain about 5% of invoiced payments from subcontractors. But the F-22 Hangar Contract prohibited Big-D from retaining such payments. In periodic reports to the government, Big-D certified that it had not withheld such payments.

47. In fact, Big-D had entered contracts with its subcontractors that gave Big-D the right to retain 5% of the subcontract price. Big-D retained funds. Big-D later determined the funds

had been withheld unlawfully and considered self-reporting the incident to the government. But Big-D management refused to self-report, fearing it would negatively impact the company's ability to win further government contracts. Instead, the decision was made to distribute the funds to the subcontractors and if any of them questioned the payment, to downplay the payment. As with the frontloading of funds, this practice gave Big-D certain financial benefits.

**B.     Big-D and other defendants engaged in fraud related to HUBZone program.**

**1.     The HUBZone Program.**

48. The HUBZone program is managed by the U.S. Small Business Administration ("SBA") to promote economic development and employment growth in distressed areas by providing access to more federal contracting opportunities.

49. To participate in the HUBZone program, an entity must qualify as a "small business concern" ("SBC") by satisfying eligibility criteria, including that it must: (1) be at least 51 percent owned and controlled by one or more U.S. citizens; (2) "qualify as a small business under the size standard" for its industry; (3) the principal office (i.e., the location where the greatest number of qualifying employees perform their work) must be located in a HUBZone; (4) "[a]t least 35% of the concern's employees must reside in a HUBZone"; and (5) "[t]he concern must represent ... that it will ensure that it will comply with certain contract performance requirements in connection with contracts awarded to it as a qualified HUBZone SBC." *13 C.F.R. § 126.200(b)*.

50. HUBZone SBCs must comply with contract provisions set forth in 13 C.F.R. § 126.700, which section states that:

> d.  "A prime contractor receiving an award as a qualified HUBZone SBC must meet the performance of work requirements set forth in §125.6(c) of this chapter." *13 C.F.R. § 126.700(a)*.

      (i) 13 C.F.R. § 125.6(c)(2) states that in a general construction contract, a "qualified HUBZone SBC prime contractor can subcontract part of a HUBZone contract" only if "the qualified HUBZone SBC spends at least 15% of the cost of contract performance incurred for personnel on the concern's employees."

    e. "In addition to the requirements set forth in §125.6(c), one or more qualified HUBZone SBCs must spend at least 50% of the cost of the contract incurred for personnel on its own employees or employees of other qualified HUBZone SBCs." *13 C.F.R. § 126.700(b)*. Regulations explicitly prohibit a HUBZone SBC from subcontracting more than 50% of the project to a non-qualified HUBZone SBC. *Id.*

51. Certified HUBZone SBCs enjoy significant contracting benefits, including competitive and sole source contracting, and/or a 10% price evaluation preference in full and open contract competitions, as well as subcontracting opportunities.

52. The government incurs enormous expense to create the benefits the HUBZone Act was designed to provide. An obvious loss suffered by the government as a result of fraud is the difference between what the government pays to award a contract to a HUBZone SBC compared to the reduced price it would pay if the contracts had been bid on a full and open basis. Presumably, the HUBZone program is designed to create more of a benefit than the 10% price adjustments permitted when evaluating HUBZone bids.

53. Large companies that violate the HUBZone laws without detection can reap enormous rewards. They can bid on projects without the typical competition they face in full and open bidding situations. Also, they can pad their bids by up to 10% to take advantage of the favorable evaluation the government affords HUBZone SBCs. As such, contracts awarded under the HUBZone program are often far more lucrative than those awarded after full and open competition.

54. Federal regulations state that persons who violate laws related to the program "are subject to civil penalties under the False Claims Act". *13 C.F.R. § 126.900(b).*

### 2. Big-D and CTI intentionally violate the HUBZone Act.

55. Big-D describes itself as "one of the nation's largest and most admired construction firms." It is not a certified HUBZone SBC. It cannot lawfully bid on projects set aside for certified HUBZone SBCs. Even so, Big-D and CTI have conspired to fraudulently obtain contracts set aside for the HUBZone program. Relator has direct knowledge of this because he has worked for both of these companies.

56. The unlawful arrangements worked (and may continue to work) as follows: Big-D or CTI identified a promising HUBZone set aside opportunity. Big-D did virtually all of the work to estimate the project and prepare the government bid for it. Prior to submission, CTI's name was placed on the documents, and they were submitted under CTI's name using its HUBZone credentials.

57. When CTI was awarded a contract, it remains little more than a conduit through which Big-D interacted with the government. For instance, Big-D personnel managed the project, including virtually all subcontractors. Big-D received and paid subcontractor invoices. Big-D prepared invoices for the government, but passed them through CTI before submission to the government. After the government paid CTI, it turned funds over to Big-D.

58. To create a paper-trail that showed CTI employees performed the required amount of work, Big-D "leased" one or more of its employees to CTI through bogus lease agreements. Upon information and belief, the leased employees had no idea they were being leased. The employees would be paid by Big-D and CTI had some arrangement to reimburse Big-D for the expense.

59. Instead of encouraging economic development in HUBZones, Big-D and CTI abused the program to obtain lucrative projects. This fraud caused obvious loss to the

government. If the government had wanted a company like Big-D to perform these contracts, it could have opened the bidding up to all contractors and it likely would have obtained lower-priced bids from Big-D and its competitors.

60. Big-D violated the HUBZone law by orchestrating a "pass through" arrangement with CTI. For instance, CTI was awarded a contract valued at $23.4 million to construct a fitness facility at Fort Carson, Colorado. After the contract was awarded, Big-D offered to pay CTI a lump sum payment to take over the project such that Big-D performed virtually all of the work, and CTI would remain as little more than a conduit through which documents would be submitted to the government. Relator was informed of negotiations to determine the amount of the payment Big-D should make CTI to take over the project. A member of CTI management later informed Relator that such an agreement had been finalized.

61. Similarly, CTI was awarded a HUBZone set aside contract valued at $4.2 million to design and build an addition to Building 415 at Kirtland Air force Base in New Mexico. Relator worked on this project for CTI as a project manager. As with the Fort Carson project, Big-D did virtually all of the work and CTI did minimal work. Subcontractor bid sheets for this project were prepared by Big-D and then passed through CTI before submission to the government.

C.   **The Section 8(a) program.**

62. Separate from the HUBZone program, the SBA also administers the Section 8(a) program to assist economically and/or socially disadvantaged business owners. As with the HUBZone program, companies that qualify for the Section 8(a) program receive assistance in receiving federal contracts.

63. Businesses must meet and maintain certain eligibility requirements to participate in the 8(a) program. Some of the requirements include (1) qualifying as a small business enterprise; (2) being majority-owned by one or more individuals who meet the SBA definition of a socially and economically disadvantaged group; (3) having the management and daily business

operations controlled by one or more owners who have been determined to be socially and economically disadvantaged; and (4) demonstrating that the entity has been in business in the industry area to which they are applying for at least two years prior to the date of their 8(a) application. *13 C.F.R. § 124.1, et seq.*

64. Just as Big-D enters into collusive arrangements with certified HUBZone SBCs to unlawfully get awarded HUBZone set aside projects, so too Big-D has colluded to receive work related to Section 8(a) set aside projects it is not qualified to receive.

65. For instance, CTI was awarded a contract under the Section 8(a) program to remodel two buildings and construct another at the Browning Reserve Center. Relator was a project manager for Big-D. Relator observed that Big-D prepared virtually all of the subcontracts for this project but passed them through CTI to submit to the government. Virtually all of the work on the project was done by or under the management of Big-D and appeared to be a typical Big-D project except for the additional burden of altering documents to appear as if they had originated with CTI and worked through CTI as a conduit for communications with the government.

66. During the summer of 2010, Relator worked at the Dinosaur National Monument for a third party on a project to install water lines. At the same time and place, another project was underway to construct a building that had been awarded to ASG under the Section 8(a) program. Relator observed that virtually all of the work on the ASG contract was performed by Big-D personnel using Big-D machinery. As part of Relator's work, he was required to speak with the management team overseeing work on the building construction project. When he inquired about the proper contact person, he was given the name of a Big-D manager.

67. Knowing that Relator had critical information about defendants' wrongful conduct, and fearing that he would disclose such information, Big-D engaged in retaliatory efforts to keep Relator silent. Relator reserves the right to amend this complaint to allege such claims.

## FIRST CAUSE OF ACTION
(Violation of False Claims Act, 31 U.S.C. § 3729, et. seq.,)

68. Relator re-alleges and incorporates the allegations of all prior paragraphs as if fully set forth herein.

69. Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims for payment or approval, knowing that the approval would come from the United States government and that the United States government would pay Defendants as a result of such approval.

70. Defendants knowingly presented, or caused to be presented, false and/or fraudulent deductive change orders for approval, knowing that the United States government would rely on the representations, that approval would come from the United States government, and the government would save less money as a result of the approval than would be saved by Defendants.

71. Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim. Defendants knowingly provide false certifications of compliance requirements of the F-22 Hangar Contract and with various federal laws, including the Buy American Act, the HUBZone Act, and laws related to the Section 8(a) set aside program. As a result of these false certifications, the United States government paid tens of millions of dollars to defendants.

72. Defendants made fraudulent statements and omissions in connection with information they provided or knew would be provided to the United States government for the purpose of getting the government to approve and pay for such applications.

73. Defendants engaged in other wrongful and fraudulent conduct described throughout this complaint.

74. Defendants' unlawful conduct was done intentionally and knowingly.

75. Defendants' conduct violates the False Claims Act, 31 U.S.C. §§ 3729 et seq.

76. The United States of America, unaware of the falsity of the claims and/or statements, and in reliance on the accuracy thereof, approved change orders, approved requests for payment of invoices, and awarded contracts worth in excess of many millions of dollars. Defendants retained for themselves benefits that should have been credited toward the government, and benefits that should have been realized as part of various federal programs, including the Buy American Act, the HUBZone Act, and the Section 8(a) program.

## SECOND CAUSE OF ACTION
(Conspiracy)

77. Relator re-alleges and incorporates the allegations of all prior paragraphs as if fully set forth herein.

78. Defendants have conspired to engage in the above-described unlawful actions, whereby they have violated 31 U.S.C.A. § 3729.

79. The United States of America, unaware of the falsity of the claims and/or statements, and in reliance on the accuracy thereof, awarded contracts, approved change orders, and made payments in excess of millions of dollars. The United States of America was damaged to the extent that these funds were paid, savings were not properly credited to the government, and benefits of various federal laws were not realized.

WHEREFORE, Relator respectfully requests this Court to enter judgment against defendants, as follows:

(a) That the United States of America be awarded damages in the amount of three times the damages sustained by it as a result of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b) That civil penalties of $11,000, pursuant to 31 U.S.C. §§ 3729, as amended by 28 C.F.R. § 85.3(a)(9), be imposed for each and every false claim that each defendant presented to the United States of America;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator and/or the United States of America necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e) That the Relator be awarded the maximum amount allowed to him pursuant the False Claims Act; and

(f) That this Court award such other and further relief as it deems proper.

DATED: December 14, 2011

UTAH LITIGATION CENTER

/S/ _____
By Victor Sipos
Attorney for Relator Bart Andersen